## In re Acker

C.P. of Blair County, no. 99 OC 443.

*George Gvozdich Jr.,* for petitioner.
*Paula Aigner,* for respondent Paul Acker.
*A. Thomas Farrell,* for respondent Shirley Acker.

CARPENTER, *J.,* May 18, 2000—This matter comes before the court for hearing on the petition of Theresa L. Brumbaugh, seeking appointment as plenary guardian of the person and estate of Paul R. Acker. The petition was filed on December 10, 1999. Depositions of Dr. Robert P. Bridenbaugh and Dr. Catherine Selth Spayd were taken on January 19, 2000, and April 12, 2000, respectively. The matter was heard by the court on April 24, 2000, to a conclusion. The record is closed and the

matter is ready for decision. That decision will be rendered in three parts. This is necessitated primarily by the alleged incapacitated person's marriage on February 14, 2000, to Mrs. Shirley Mock. This marriage raises additional issues relating to Mr. Acker's competency, the appropriateness of the proposed guardian, and ultimately the validity of the alleged marriage. We will discuss in order, the appointment of a guardian for Mr. Acker's estate, the appointment of a guardian for his person and the status of his marriage.

## I. GUARDIAN OF THE ESTATE OF
## PAUL R. ACKER

This issue is the least complicated issue before the court. Counsel for the petitioner, Theresa Brumbaugh, for Mr. Acker, and for Shirley Mock (Acker) are all in agreement Hollidaysburg Trust should be appointed guardian of the estate of Paul R. Acker. We are satisfied, based on the deposition testimony of Dr. Bridenbaugh and Dr. Spayd, Mr. Acker is mentally impaired to the extent he is both unable to make, communicate, or participate in decisions regarding his estate. This includes an inability to manage his property, the risk of dissipation of his assets, and a likelihood he could become the victim of designing persons. As such, a plenary guardian is clearly indicated. Accordingly, Hollidaysburg Trust is appointed as guardian of the estate of Paul Acker to file with this court a report on an annual basis including all the information required pursuant to 20 Pa.C.S. §5521(c). The guardian of the estate to be bonded according to law. We have additionally reviewed the testimony of the petitioner, Donald Acker, Suzanne Claar Acker, and Paul Acker. We are satisfied sufficient evi-

dence has been produced to establish the nature and extent of the alleged incapacities and disabilities of Mr. Acker. His present mental, emotional, and physical conditions, adaptive behavior, and social skills demonstrate the need for a guardian for his estate. We are also satisfied Mr. Acker's condition is reasonably expected to deteriorate with time.

## II. GUARDIAN OF THE PERSON OF PAUL R. ACKER

The next issues before the court are the necessity of a plenary guardian for the person of Paul R. Acker and whether petitioner's daughter, Theresa Brumbaugh, should serve in that capacity. Based on our review, we are satisfied both as to the need for a plenary guardian and Theresa Brumbaugh as that guardian.

The testimony of Theresa Brumbaugh, Donald Acker, and Suzanne Claar establish their father's residence has been the Alzheimer's wing at Homewood since 1997. Mr. Acker's medical problems began with seizures in 1981, subsequent heart trouble, and several strokes in 1993. Theresa Brumbaugh obtained a power of attorney in 1993 and durable power of attorney in 1997. She has handled her father's investments, doctor's appointments, and bills since his admission to Homewood. Her observation is her father is disoriented to a degree where his safety is jeopardized without constant care. As specific examples of his limitations, he tends to get lost when he is walking, leaves water running from faucets, and runs the microwave oven dangerously long. These examples are consistent with the deficits outlined in the doctor's depositions demonstrating Mr. Acker's daily living risks if unattended. Mr. Acker can perform basic tasks, *i.e.*

dress himself, eat, and shave. Clearly, Mr. Acker's difficulties stem more from his judgment than they do his physical ability to perform the actual acts of caring for his person. Mrs. Brumbaugh is satisfied both Outlook Pointe and Homewood provide the level of care that her father needs.

Donald Acker testified to his observations of his father. He described Mr. Paul Acker as having almost no short-term memory. He vividly recalls his father getting lost when taking a walk while visiting him recently in Lancaster. He also recalls his father's inability to recall where he lived on that visit. Like his sister, Mr. Acker has grave reservations as to his father's judgment.

We found this testimony consistent with the medical depositions. Dr. Roger Bridenbaugh has been Mr. Acker's family doctor since September 1984. (Deposition of Dr. Bridenbaugh, p. 6.) He testified Mr. Acker presently suffers from a medical condition which raises questions as to his capacity. (Dr. Bridenbaugh deposition, p. 6.) Dr. Bridenbaugh attributes these deficiencies to multiple strokes leading to multi-infarct dementia mentally and functioned quite well. Following the strokes, he had problems with memory and confusion to the point his condition deteriorated living at home. This was true even though a caretaker stayed with him from 1993 on.

Mr. Acker was admitted to Homewood Nursing Home in 1997. He was placed in the dementia unit (Alzheimers) which is a locked unit. He did well in that setting. Dr. Bridenbaugh described Mr. Acker as superficially seeming "okay," but when given mental function tests you pick up his deficits. (Dr. Bridenbaugh deposition, p. 78.) Dr. Bridenbaugh was unequivocal Mr. Acker is not able to manage his financial affairs. (Dr. Bridenbaugh

deposition, p. 9.) He was similarly unequivocal Mr. Acker is unable to make and communicate responsible decisions relating to his financial affairs, any properties, and/or business matters. (Dr. Bridenbaugh deposition, p. 9.)

As to his person, he offered the opinion Mr. Acker would be much safer in a structured environment where somebody gives him his medicine and supervises all of his activities. He described Mr. Acker as able to function outside an institution depending on the skill of the caretaker, but unable to get his own apartment and live on his own without a caretaker. (Dr. Bridenbaugh deposition, p. 9.) He described Mr. Acker's condition from the strokes as fairly stable at present. Mr. Acker takes Coumadin, Ginko Biloba, Dilantin, and Phenobarbital, as well as an anti-depressant and Prinivil for heart function. (Dr. Bridenbaugh deposition, p. 11.) Mr. Acker is capable of carrying on a normal conversation on a superficial basis which would lend an appearance there is nothing wrong. However, his mental capabilities are distinctly lacking. (Dr. Bridenbaugh deposition, pp. 11 and 12.) This is not expected to be reversed. Dr. Bridenbaugh's optimal prognosis is the condition remains stable and does not deteriorate any further. This is largely subject to whether he has more stroke episodes. Dr. Bridenbaugh offered the opinion Mr. Acker could understand the proceedings with respect to his capacity when explained to him in simplistic terms. (Dr. Bridenbaugh deposition, p. 16.) He described Mr. Acker's relationship with his daughter as a good relationship. (Dr. Bridenbaugh deposition, p. 17.)

The testimony of Dr. Spayd, a clinical psychologist, who has had the opportunity to examine Mr. Acker and test him in both June of 1999 and February of 2000 is

remarkably consistent with the other evidence. The first evaluation was done by Dr. Spayd in two parts on June 8, 1999, and June 29, 1999, while Mr. Acker was a resident at Homewood. The second opportunity to evaluate and test Mr. Acker was done at Bon Secour Holy Family Hospital on February 3, 2000. At that time, he was living at Outlook Pointe. On June 8, 2000, Dr. Spayd administered the Folstein mini mental state examination to Mr. Acker. On June 29, 2000, she administered the Mattis dementia rating scale, the WAIS-R comprehension subtest, the Rivermeade behavioral memory test, the Boston naming test, and a clock drawing task. (Dr. Spayd deposition, p. 10.) On February 3, 2000, she again administered the Mattis dementia rating scale, the WAIS-R comprehension subtest, and the clock drawing task.

The results of these tests were summarized by Dr. Spayd as demonstrating a number of impairments. Mr. Acker exhibited mild impairment in the area of orientation, significant impairment in the area of attention, and problems with verbal recall. These were the main areas of deficit. (Spayd deposition, p. 12.) He fell significantly below test levels for dementia. The Mattis DRS test which suggested these findings was repeated both in June of 1999 and February 2000. The consecutive testing indicated his condition was deteriorated even from June 1999 to the test eight months later in February 2000. (Dr. Spayd deposition, p. 13.) On the Rivermeade behavioral memory test, which is designed to replicate happenings in a person's general environment measuring functional memory, he scored in the moderately to severely impaired range. (Dr. Spayd deposition, pp. 13-14.) On the WAIS-R comprehension test measuring social judgment (which is particularly relevant to these

proceedings in terms of his abilities to understand and be able to make good judgments in his social environment such as marriage), the patient performed poorly on both occasions, but significantly worse in February. His scores were well below the norm of his same age peers. (Dr. Spayd deposition, p. 15.) In fact, this test represented his most significant area of decline from June 1999 to February 2000. (Dr. Spayd deposition, p. 15.)

Dr. Spayd rendered similar findings to Dr. Bridenbaugh's as to Mr. Acker's ability to manage his financial affairs and/or make and communicate responsible decisions regarding his person or his estate. She also expressed concern as to his ability to weigh and evaluate factors necessary to decide if it was prudent for him to enter into marriage. (Dr. Spayd deposition, p. 16.) (We should note Dr. Bridenbaugh was not asked questions relating to Mr. Acker's capacity to enter into marriage since he did not marry until February 14, 2000, which was after the date of Dr. Bridenbaugh's January deposition.) Dr. Spayd offered the opinion Mr. Acker's condition requires the appointment of a guardian to manage his affairs. He is not capable of living outside a structured setting (such as Outlook Pointe) without endangering himself or others unless he had 24 hours supervision by a responsible party, in her opinion. (Dr. Spayd deposition, pp. 17-18.) She rendered this opinion due to his variety of cognitive deficits including memory, attention, judgment, and problem solving. She did not believe he would be able to safely care for himself unless supervised by someone who could assist him. He would not be likely to remember to take his medication appropriately (or even what medication he is on). She offered the analogy if someone smells smoke they have to make

a judgment there is danger. Daily living requires problem solving. Because of his impairments, should there be an emergency event, the witness had no confidence Mr. Acker would safely care for himself. (Dr. Spayd deposition, pp. 18-19.)

Clearly, the testimony establishes the need for a plenary guardian. Theresa Brumbaugh has the full support of her brother and her sister as that guardian. The only issue jeopardizing her appointment is the status of Mr. Acker's present wife. We will discuss this presently.

### III. STATUS OF MR. ACKER'S FEBRUARY 14, 2000 MARRIAGE

Finally, we reach the issue of Mr. Acker's marriage on February 14, 2000, to Shirley Mock. This issue potentially impacts this court's determination in numerous respects.

First, with respect to Mr. Acker's estate, it impacts the decision to appoint Hollidaysburg Trust Company and the creation of a trust since a wife necessarily would have an interest in the property involved. It would also impact Mr. Acker's estate during his lifetime in the event of a divorce or separation. At his death, it certainly impacts his estate and his present will. Similarly, it would impact the appointment of the guardian for his person both as to the necessity of that appointment (since he has a wife to take care of him) and the specific appointment of Theresa Brumbaugh, his daughter, as opposed to that wife. It was with all of these concerns in mind Attorney Farrell was appointed as counsel for Shirley Mock in this proceeding.

It is certainly important to review the history of this marriage. According to her testimony, Shirley Mock first

commenced her relationship with Mr. Acker in December 1998, at a church gathering at New Year's. Following this New Year's meeting, she took him out almost every weekend from Homewood and later Outlook Pointe. Mr. Acker's mental state has not presented any significant problems for her. When confronted with the belief by various family members she had failed to properly administer Mr. Acker's medications, she denied this and indicated no one contacted her with respect to this. As time has passed, she now sees Mr. Acker not only on weekends but occasionally during the week.

Several dates for a wedding were planned, but were not convenient for Mr. Acker's children. Finally, they decided on Valentine's Day. She left the decision to tell his children to him. She believes this is a money issue for the children (as does Mr. Acker). Per the witness, Mr. Acker did not want a prenuptial agreement. She volunteered if Mr. Acker were residing with her, home nursing could be involved to monitor medications. She cannot afford to live at Outlook Pointe but would be willing to live there with Mr. Acker if finances were available. She observes while Mr. Acker is forgetful on occasions, problems such as leaving ovens on, water running, or getting lost have not been part of her experience with him. She married Mr. Acker with knowledge of the fact this petition had been filed regarding his capacity. She claims to have had no concerns about this petition and simply wanted to give him a life. She describes him as slow because of his strokes but no worse than that. She would not leave him alone, although she believes leaving him alone would not present a problem as he would not be likely to get into trouble in her judgment. She

believes he understands dangers, and/or she can control the situation.

Mrs. Acker, Theresa Brumbaugh, and Donald Acker all testified as to attempts to work out the issue of Mr. Acker marrying. All parties, including Mr. Acker when he testified, agreed a prenuptial agreement was discussed as early as mid-1999 (long before this petition was filed) so his long range care would be guaranteed. Nothing appears to have been totally resolved.

Mr. Acker also testified. He candidly indicated his problems with his children regarding this hearing and his marriage. He stated affection for Shirley and his belief he could take care of her. While he likes Outlook Pointe, he would rather live at Shirley's where there is more privacy and he could take care of things. He expressed how "terrible" it was to be before the court in this situation.

The children testified to their attempts to talk "some measure of sense" to both their father and Shirley. They have strong beliefs she does not understand what she is getting into, has already failed on several occasions to properly administer medications, and does not understand (because she has never lived with their father) the level of care required. They have grave concerns that level of care is beyond Shirley Mock given her own health limitations.

We believe this fairly paints the picture before the court. That we have stated it in detail demonstrates our understanding. However, that understanding impacts our actual decision little if at all. These parties have come before the court. We have made a finding of incapacity with respect to Mr. Acker. As such, this is no longer a matter of negotiation, prenuptial agreements, or any "un-

derstanding." We must view the validity of this marriage under the law.

Those principles which guide this court are substantially stated in 23 Pa.C.S. §3304 which provides in pertinent part:

"[W]here there has been no confirmation by cohabitation following the removal of an impediment *the supposed or alleged marriage of a person shall be deemed void in the following cases:*

"(3) *Where either party to such marriage was incapable of consenting by reason of* insanity or *serious mental disorder or otherwise lacked capacity to consent* or did not intend to consent to the marriage

"(b) *procedures*—in all cases of marriages which are void, the marriage may be annulled as set forth in section 3303 (relating to annulment, void, and voidable marriages) or *its invalidity may be declared in any collateral proceeding.*"

We have stated the applicable law. We are engaged in a collateral proceeding to determine Mr. Acker's capacity during the very time frame when marriage occurred. He is incapacitated. That impediment has not been removed. We believe we *must necessarily* determine the validity of this marriage as part of our proper judicial function in this case. We concede no one specifically asked this court in any pleading to void the marriage. Indeed, as a practical matter, such a request would strain relations among these parties to the breaking point. It was rather "suggested" to this court that we have the authority to void the marriage. On that issue, there is no disagreement. We believe we are charged to deal with this issue. Having so concluded, there can only be one result. This marriage must be declared void.

That this is correct is supported by all the evidence without exception. Additionally, it was directly addressed by Dr. Spayd as follows in her April 12, 2000 deposition:

"Q. Okay. Is it your testimony, doctor, that Mr. Acker's decision-making process with respect to his marriage was impaired as a result of his cognitive deficits?

"A. Yes.

"Q. Are you saying then that under no circumstances is Mr. Acker able to make a rational decision to enter into a marital relationship?

"A. Yes. That's what I'm saying." (Dr. Spayd deposition, p. 24.)

This testimony could hardly be clearer or less equivocal. As such we believe action by this court is both appropriate and necessary.

In so holding, we make our own judgment on the capacity issue relying on the expert testimony. This is an issue for expert testimony. We cannot be swayed by the attempts of Mr. Acker's children to allow his marriage while protecting his assets. We cannot be swayed by the arguments by the children, Shirley Mock might not be up to the task of caring for their father. We cannot be swayed by Shirley Mock's willingness to take on the care of Mr. Acker nor her affection for him (which we have no reason to doubt). We cannot be swayed by Shirley's views of Mr. Acker's abilities (compared to his family and the professionals) or her expressed belief she can care for him without residential placement.

We are dealing with the issue of a marriage. It is a marriage which lacked valid legal consent according to a reputable clinical psychologist who evaluated and tested Mr. Acker *the same month (February 2000) this*

502

*marriage took place.* The other evidence in the case supports and reinforces that conclusion. We necessarily find his incapacity existed at the time this marriage occurred. Accordingly and consistent with all of the above, we enter the following order:

(1) Hollidaysburg Trust be appointed as the plenary guardian of the estate of Mr. Acker subject to all the provisions contained in this opinion relating to accountings and bondings;

(2) Theresa Brumbaugh be appointed plenary guardian of his person with full power to act on his behalf according to law;

(3) The marriage of Paul R. Acker to Shirley Mock is declared void by this court. In the interest of completeness we cite to the ability of Pennsylvania court to determine the validity of a Maryland marriage involving Pennsylvania residents (see generally, *Schaffer v. Schaffer,* 189 Pa. Super. 120, 149 A.2d 578 (1959)).

Any appeal of this order to be taken within 30 days of the date of its entry.